United States District Court
Southern District of Texas
FILED

FEB 01 2022

Nathan Ochsner, Clerk

United States District Court
Southern District of Texas

**ENTERED**

February 01, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | | |
|---|---|---|
| **ANGELITOS HEALTH CARE, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 7:20-CV-0035** |
| | § | |
| **XAVIER BECERRA, Secretary, United** | § | |
| **States Department of Health and Human** | § | |
| **Services,** | § | |
| | § | |
| **Defendant.** | § | |

## REPORT AND RECOMMENDATION

Plaintiff Angelitos Health Care, Inc. seeks judicial review of a final decision by the Secretary (the "Secretary") of the U.S. Department of Health and Human Services ("HHS") that Plaintiff was overpaid by around $1.3 million in Medicare claims for home health care services.[1]

An HHS program integrity contractor audited a sample of beneficiary claims submitted by Plaintiff during a two-year period, determining the amount of overpayment by a statistical extrapolation of the sample claims. Upon receiving notice of the overpayment, Plaintiff invoked the multi-level Medicare administrative review process. Plaintiff challenged the determination that some of the sample claims were not covered by Medicare, as well as the statistical validity of the sampling method and extrapolation procedures.

After partially favorable rulings at the initial levels of administrative review, an Administrative Law Judge ("ALJ") issued a decision that was also partially favorable to Plaintiff. Although the ALJ upheld the statistical sample and extrapolation methodologies, the ALJ found

---

[1] Effective March 19, 2021, Xavier Becerra replaced Alex M. Azar II as the Secretary of HHS. Under Rule 25(d) of the Federal Rules of Civil Procedure, Secretary Becerra is automatically substituted as a party.

that some of the sample claims were fully or partially covered by Medicare. Plaintiff then filed a request for a review with the Medicare Appeals Council (the "Council"). The Council vacated and remanded the ALJ's decision as to several sample claims, noting that the records for such beneficiaries were missing or incomplete. The Council also reversed on one sample claim, determining that it was indeed covered by Medicare, and either adopted or modified the decision that the remaining claims were not covered. The Council did not address Plaintiff's statistical sampling and extrapolation claim on the basis that it was not properly raised.

Appealing that final decision, Plaintiff raises four main claims that, for practical purposes, are organized as follows: (1) the statistical sampling and extrapolation procedures were improper; (2) the Council erred in determining that sample claims failed to meet conditions of Medicare participation and payment; (3) the Council applied incorrect standards in determining that sample claims were not covered and that such determinations were not supported by substantial evidence; and (4) any liability for overpayment is otherwise waived or limited by statute.

Pending now are the parties' cross motions for summary judgment. (Dkt. Nos. 26 & 27). The parties have filed respective responses to these motions. (Dkt. Nos. 28 & 29). Plaintiff has also filed a Motion for Attorney's Fees (Dkt. No. 30), which the Secretary opposes (Dkt. No. 32).

This case was referred to the Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1). After review of the parties' briefing, the record, and relevant law, the Magistrate Judge RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. No. 27) be GRANTED in part and DENIED in part, that the Secretary's Motion for Summary Judgment (Dkt. No. 26) be GRANTED in part and DENIED in part, that the Motion for Attorney's Fees (Dkt. No. 30) be DENIED as premature, and that the final decision of the Secretary be VACATED and REMANDED to the agency for further proceedings consistent herewith.

# I. BACKGROUND

## A. The Medicare Framework and Home Health Services

Medicare is a federally funded health insurance program for the elderly and disabled. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506 (1994) (quotations omitted). The program, among other things, reimburses health care providers who render services to its beneficiaries. *Maxmed Healthcare, Inc. v. Price*, 860 F.3d 335, 337 (5th Cir. 2017). The Centers for Medicare and Medicaid Services ("CMS"), a division of HHS, is responsible for administering the Medicare program. *See Big Bend Hosp. Corp. v. Thompson*, 88 F. App'x 4, 5 (5th Cir. 2004) (per curiam).

As a general matter, Medicare does not cover services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]" 42 U.S.C. § 1395y(a)(1)(A). More specific coverage requirements may apply depending on the nature of the services, such as the home health services at issue here.

Home health services consist of medical care, such as skilled nursing and physical therapy services, provided to patients in their homes. *See* 42 U.S.C. § 1395x(m). To qualify for Medicare coverage for such services, a beneficiary must meet three main conditions. *See* 42 C.F.R. § 409.42 (2009). First, the beneficiary must be confined to the home, or "homebound." *Id.* at 409.42(a). A beneficiary is homebound if they "ha[ve] a condition, due to an illness or injury, that restricts the[ir] ability . . . to leave [their] home except with the assistance of another individual or the aid of a supportive device[,]" or if they have "a condition such that leaving [their] home is medically contraindicated." 42 U.S.C. § 1395f(a). Second, the beneficiary must be under a physician's care. 42 C.F.R. § 409.42(b) (2008). Third, they must need skilled medical services. *Id.* at § 409.42(c). CMS promulgates other regulations and guidance that further elaborate on coverage conditions, including the Medicare Benefit Policy Manual (the "MBPM"), which CMS periodically updates.

CMS contracts with Medicare Administrative Contractors ("MACs"), which are private government contractors, to process and make payments on Medicare claims by service providers. *See, e.g.*, 42 U.S.C. § 1395kk-1.  To expedite claims processing, MACs typically reimburse providers for services before reviewing the medical records relating to the claims and verifying that the claims are valid.  *See John Balko & Assocs., Inc. v. Sec'y U.S. Dep't of Health & Hum. Servs.*, 555 F. App'x 188, 190 (3d Cir. 2014).  "A provider's claims which were initially paid as a matter of course may eventually be reviewed by a Zone Program Integrity Contractor ("ZPIC"), and if the ZPIC's audit determines that the provider was overpaid, the MAC sends the provider a letter demanding repayment."  *Infinity Healthcare Servs., Inc. v. Azar*, 349 F. Supp. 3d 587, 590 (S.D. Tex. 2018).  This audit process typically involves the use of statistical sampling and extrapolation procedures, which are a permissible method of calculating overpayments.  *See Rio Home Care, LLC v. Azar*, 2019 WL 1411805, at *3 (S.D. Tex. March 11, 2019), *report and recommendation adopted*, 2019 WL 1409733 (S.D. Tex. Mar. 28, 2019).  Upon receipt of a demand letter, a provider may challenge the ZPIC's overpayment decision by invoking the multi-level Medicare administrative review process.  *See id.* at *2-3.

The Fifth Circuit has summarized the Medicare administrative review process as follows:

First, [the provider] may submit to the MAC a claim for redetermination of the overpayment.  Second, it may ask for reconsideration from a Qualified Independent Contractor ("QIC") hired by CMS for that purpose.  If the QIC affirms the MAC's determination, the MAC may begin recouping the overpayment by garnishing future reimbursements otherwise due the provider.

Third, the provider may request *de novo* review before an ALJ within the Office of Medicare Hearings and Appeals (OMHA), an agency independent of CMS.  The ALJ stage presents the opportunity to have a live hearing, present testimony, cross-examine witnesses, and submit written statements of law and fact.  The ALJ shall conduct and conclude a hearing and render a decision not later than 90 days after a timely request.  Fourth, the provider may appeal to [the Council], an organization independent of both CMS and OMHA.  The Council reviews the ALJ's decision *de novo* and is similarly required to issue a final decision within 90 days.  Furthermore,

if the ALJ fails to issue a decision within 90 days, the provider may "escalate" the appeal to the Council, which will review the QIC's reconsideration.

*Family Rehab., Inc. v. Azar*, 886 F.3d 496, 499-500 (5th Cir. 2018) (citations and ellipses omitted).

A provider dissatisfied with the Secretary's final decision may seek judicial review by commencing a civil action in an appropriate federal district court.  42 U.S.C. § 1395ff(b)(1)(A).

## B.  Administrative Procedural History

This case stems from a payment audit for home health services that Plaintiff provided from March 4, 2008 through November 30, 2009 (the "Service Period").  (*See* Dkt. No. 10-4 at 530-31).

### 1.  Initial Audit

On April 1, 2011, Health Integrity, Inc. ("Health Integrity"), a Medicare ZPIC, issued a summary of its audit, which concerned a universe of 367 paid Service Period claims.  (*Id.*).  Health Integrity randomly selected a sample of 44 Service Period claims and determined, for varying reasons, that 34 of those claims were not covered by Medicare.[2]  (*Id.*).  Regarding these sample claims, Health Integrity determined that the amount of overpayment was $183,229.20.  (*Id.* at 530). Dividing this actual overpayment amount by the number of claims in the sample (i.e., 44) resulted in an average overpayment per claim of $4,164.30, which figure was used by Health Integrity to calculate a projected overpayment amount of $1,528,298.10 for all claims during the Service Period.  (*Id.*).  Health Integrity determined that it was "90 [percent] confident that the overpayment was at least $1,310,496," which figure constituted Health Integrity's requested amount of overpayment.  (*Id.*).

---

[2] For reference, Health Integrity determined that eleven of the claims were not covered solely because the beneficiary was not homebound, eighteen were not covered because the beneficiary was not homebound and relevant documentation did not support a finding that the services were reasonable and necessary, three were not covered solely because relevant documentation did not support a finding that the services were reasonable and necessary, one was not covered due to a lack of documentation, and one was not covered because the beneficiary was not homebound and due to a lack of documentation. (Dkt. No. 10-4 at 531).

2. Redetermination and Reconsideration

On July 14, 2011, Plaintiff submitted a request for redetermination regarding the denied claims, which redetermination was conducted by Palmetto GBA ("Palmetto"), a private government contractor. (*See* Dkt. No. 10-3 at 862-63). This redetermination resulted in a partially favorable decision for Plaintiff, as Palmetto determined that several claims at issue were partially covered by Medicare. (*See id.* at 862, 871, 880, 929; Dkt. No. 10-4 at 83).

Subsequently, Plaintiff requested reconsideration from MAXIMUS Federal Services ("MAXIMUS"), a Medicare QIC. (*See* Dkt. No. 10-4 at 458). MAXIMUS determined that one additional claim was covered by Medicare but that Health Integrity otherwise used the appropriate statistical sampling and extrapolation procedures. (*Id.* at 392, 415-18). Upon reconsideration, Plaintiff's overpayment was recalculated and lowered to $1,102,707. (Dkt. No. 10-1 at 4).

3. ALJ Review

On October 2, 2012, Plaintiff filed a request for a hearing before an ALJ, raising three broad issues: (1) whether Health Integrity used improper statistical sampling procedures during its audit; (2) whether the claims at issue were covered by Medicare; and (3) whether waiver or limitation on liability was available under the Social Security Act. (Dkt. No. 10-1 at 73-74).

On June 21st and 22nd of 2016, a telephonic hearing was held before the ALJ.[3] (*Id.* at 73). In support of the statistical sampling and extrapolation claim, Plaintiff presented the testimony of Dr. Harold Haller, whom the ALJ acknowledged to be an expert in the field of statistics. (*Id.*).

On July 12, 2017, the ALJ issued a decision.[4] (*Id.* at 70-72). The ALJ upheld Health Integrity's statistical sampling and extrapolation procedures. (*Id.* at 126-27). As for the matter of

---

[3] Neither the record nor the pleadings explain the gap between the request for hearing and the hearing itself.

[4] This was, in fact, an amended decision. Because a review of the record does not reveal the ALJ's original decision, it is unclear how that decision differed from the amended decision. In a footnote to the Council's

coverage, the ALJ determined that three sample claims were covered by Medicare, that another claim was partially covered, and that the remaining 24 claims were not covered. (*Id.* at 126). The ALJ also held that no doctrine of waiver or limitation on liability applied to Plaintiff. (*Id.*).

    4. <u>The Council's Review</u>

    On December 11, 2017, Plaintiff filed a request for review before the Council. (Dkt. No. 10-1 at 6). In addition to challenging the ALJ's determination that the sample claims were not covered by Medicare (or only partially covered), Plaintiff reasserted the claim to waiver or limitation of liability assuming any overpayment were upheld. (*Id.* at 69). Regarding the statistical sampling and extrapolation claim, Plaintiff simply indicated the intent to "re-raise all of its arguments posed in its position paper submitted to the ALJ for the ALJ's review." (*Id.*).

    In challenging the ALJ's non-coverage determinations, Plaintiff cited to the Tenth Circuit's then-recent decision in *Caring Hearts Personal Home Services, Inc. v. Burwell*, 824 F.3d 968 (10th Cir. 2016) (Gorsuch, J.). (*Id.* at 5). Plaintiff argued that the *Caring Hearts* court articulated applicable law regarding the standard for determining whether a beneficiary is homebound and whether home health services are reasonable and necessary. (*Id.* at 14). Plaintiff further argued that *Caring Hearts* constituted binding authority over the Council pursuant to 20 C.F.R. § 404.985. (*Id.* at 15). For reference, § 404.985 provides in part that the agency "will apply a holding in a United States Court of Appeals decision that [the agency] determine[s] conflicts with [the agency's] interpretation of a provision of the Social Security Act[.]" 20 C.F.R. § 404.985(a).

    In its decision of December 3, 2019, the Council noted that the record as to five of the beneficiary claims was incomplete and thus vacated and remanded the ALJ's decision on those

---

subsequent decision and order, the Council acknowledged that "[t]he digital record [it] received [did] not contain a copy of the ALJ's original decision." (Dkt. No. 10-1 at 4 n.1).

claims.[5]  (Dkt. No. 10-1 at 3).  The Council also deemed that Plaintiff had failed to properly raise the statistical sampling claim insofar as Plaintiff did not identify the contested parts of the ALJ's statistical sampling decision and did not articulate the nature of the disagreement.  (*Id*. at 5).  The Council thus adopted the ALJ's determination on this issue "without further discussion."  (*Id*.).

The Council then addressed whether the remaining twenty claims were covered by Medicare.  According to the Council, the ALJ erred in finding that the home health services Plaintiff provided to one beneficiary, specifically N.R.,[6] were not reasonable and necessary and thus reversed the ALJ's non-coverage determination as to that claim.[7]  (*Id*. at 32-33).  Regarding the remaining nineteen sample claims, the Council either adopted the ALJ's finding that the claims were not covered by Medicare or modified without reversing the ALJ's non-coverage determination.  (*Id*. at 17-39).  More specifically, the Council determined that:

- Eight claims, as to E.C., E.G#2, E.G.#3, R.H., L.L., O.L., E.S.#1, and E.V., were not covered because (i) the beneficiaries were not homebound and (ii) the services were not reasonable and necessary (*id*. at 19-23, 25-30, 33-34, 36-37);

- Three claims, as to E.H., G.S., and M.V., were not covered because the services were not reasonable and necessary (*id*. at 24-25, 35-38);

- Two claims, as to J.L. and S.P., were not covered because (i) documentation was insufficient to determine whether the beneficiaries were homebound and the services were reasonable and necessary and (ii) conditions of participation and payment were not met (*id*. at 28-29, 31-32);

- One claim, as to E.B., was not covered because (i) the services were not reasonable and necessary and (ii) conditions of participation and payment were not met (*id*. at 17-19);

- One claim, as to J.M., was not covered because (i) the beneficiary was not homebound and (ii) conditions of participation and payment were not met (*id*. at 30-31);

---

[5] Neither party challenges the Council's decision to remand those claims.

[6] For the purposes of this report, the Magistrate Judge will refer to each beneficiary by their initials.

[7] Neither party challenges the Council's decision regarding N.R.

- One claim, as to E.G.#1, was not covered because conditions of participation and payment were not met (*id.* at 20-21);

- One claim, as to E.S.#2, was not covered because (i) a document referred to as a "plan of care" was not dated, as required, and (ii) the beneficiary was not homebound (*id.* at 34-35);

- One claim, as to A.Z., was not covered because (i) the plan of care was not dated and (ii) the services were not reasonable and necessary (*id.* at 38-39); and

- One claim, as to J.P., was not covered because the beneficiary was not homebound (*id.* at 31).

In determining that these sample claims were not covered by Medicare, the Council deemed *Caring Hearts* to be inapplicable. (*Id.* at 16). The Council first interpreted § 404.985(a) to make a federal circuit court's opinion binding only in Social Security appeals. (*Id.*). Additionally, the Council pointed out that because Plaintiff was based in Texas, which is in the Fifth Circuit, the Tenth Circuit's *Caring Hearts* decision was not binding. (*Id.*). The Council also noted that *Caring Hearts* focused on provisions of the MBPM, which the Council is merely required to "afford substantial deference" and not "regulations . . . which the Council . . . [was] bound by[.]" (*Id.* at 17). According to the Council, the—

> regulations and MBPM guidance in effect at the time of the dates of service at issue provide[d] extensive requirements and examples for determining reasonable and necessary home health services that the court in *Caring Hearts* did not consider.

(*Id.*).

Lastly, the Council addressed Plaintiff's claim of entitlement to waiver or limitation of liability, specifically considering 42 U.S.C. § 1395pp. (*Id.* at 39-40). Section 1395pp provides, inter alia, that a provider will not be held liable for overpayment where they "did not know, and could not reasonably have been expected to know, that payment would not be made for such items or services under [Medicare]." *See* 42 U.S.C. § 1395pp(a)(2). In rejecting Plaintiff's claim, the

Council determined that Plaintiff "had constructive knowledge of the coverage criteria for home health services in effect on the dates of service at issue." (Dkt. No. 10-1 at 40).

## II. CLAIMS ON JUDICIAL REVIEW

Now, on judicial review, Plaintiff asserts the following claims which, for practical purposes, are organized as follows: (1) Health Integrity applied improper statistical sampling and extrapolation procedures during its audit of the Service Period claims; (2) the Council erred by affirming the ALJ's non-coverage determinations regarding certain sample beneficiary claims on the basis that applicable conditions of participation were not met; (3) the Council applied incorrect standards in determining that certain sample beneficiary claims were not covered by Medicare and that such determinations were not supported by substantial evidence; and (4) Plaintiff is entitled to a waiver of liability pursuant to § 1395pp as a provider "without fault."[8] (Dkt. No. 1 at 5-9). For avoidance of doubt, the above list of beneficiaries constitutes the universe of beneficiaries whose claims are addressed as part of this appeal. Plaintiff has filed an exhibit setting out the location of each beneficiary's file in the administrative record. (*See* Dkt. No. 29-1).

## III. LEGAL STANDARD

Summary judgment is a proper mechanism for reviewing an agency's final decision. *Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 214 (5th Cir. 1996) (per curiam). Summary judgment must be granted when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the case under governing law and is genuinely in dispute if a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[8] In the Complaint, Plaintiff presented what appears to be two distinct waiver of liability claims: the first based on § 1395pp and the second based on a contention that Plaintiff is a provider "without fault." (Dkt. No. 1 at 7-9). On summary judgment, however, Plaintiff effectively combines these claims. (Dkt. No. 27 at 16-17). Accordingly, the Magistrate Judge will treat these claims as one.

Pursuant to 42 U.S.C. § 405(g), a district court's review of a final agency decision is limited to (1) whether the agency applied the proper legal standards and (2) whether substantial evidence on the record as a whole supports the agency's decision.[9] *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000) (per curiam).

An agency's actions are assessed based on the statutes and regulations in effect at the time of the relevant activity. *Texas v. EPA*, 829 F.3d 405, 430 (5th Cir. 2016). Because "Congress charged the Secretary with the primary responsibility for interpreting the cost reimbursement provisions of the Medicare Act, . . . courts accord particular deference to [the Secretary's] interpretation of Medicare legislation[,]" and "unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation, [a court] must defer to the Secretary's interpretation." *Girling*, 85 F.3d at 215 (quoting *Thomas Jefferson*, 512 U.S. at 512) (quotations omitted). Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards. *Huang v. Admin. Rev. Bd. U.S. Dep't. of Lab.*, 2013 WL 4042008, at *6 (S.D. Tex. Aug. 8, 2013) (quoting *Palisades Gen. Hosp. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005)) (quotations omitted).

Substantial evidence is "more than a scintilla" or "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

---

[9] Section 405(g) is made applicable in Medicare overpayment cases by statute. *See* 42 U.S.C. § 1395ff(b)(1)(A). Recently, however, the Fifth Circuit addressed whether the "arbitrary and capricious" standard found at 5 U.S.C. § 706(2)(A) of the Administrative Procedure Act may control. *See Maxmed*, 860 F.3d at 340. Assuming for the sake of argument that the arbitrary and capricious standard applied, the Fifth Circuit commented that choosing between these "standard[s] of review probably makes no difference[.]" *Id.* (quoting *Baylor Cty. Hosp. Dist. v. Price*, 850 F.3d 257, 261 (5th Cir. 2017)) (internal quotations omitted). Here, the parties refer only to the § 405(g) standard.

"Conflicts in the evidence are for the Secretary and not the courts to resolve." *Selders v. Sullivan*,

914 F.2d 614, 617 (5th Cir. 1990) (per curiam) (citing *Patton v. Schweiker*, 697 F.2d 590, 592 (5th

Cir. 1983)).  Courts are to scrutinize the record to determine whether there is substantial evidence

but "may not reweigh the evidence, try the issues *de novo*, or substitute [their] judgment for that

of the Secretary." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).  This standard, however,

"is not a rubber stamp for the Secretary's decision and involves more than a search for evidence

supporting the Secretary's findings." *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985) (quoting

*Tome v. Schweiker*, 724 F.2d 711, 713 (8th Cir. 1984)) (quotations omitted).

## IV.  ANALYSIS

Plaintiff's four claims for review, as summarized above, will be addressed in turn.

### A.  Health Integrity's Statistical Sampling and Extrapolation Procedures

Plaintiff claims that Health Integrity used improper statistical sampling and extrapolation

procedures in auditing the Service Period claims.  (Dkt. No. 1 at 7; Dkt. No. 27 at 17).  According

to Plaintiff, Health Integrity deviated from regulatory guidance, specifically, the Medicare

Program Integrity Manual.  (Dkt. No. 1 at 7).  Plaintiff refers to Dr. Haller's testimony before the

ALJ, which supposedly demonstrated that Health Integrity's extrapolation methodology "was not

only a deviation from the rules[ ] but was also inappropriate for . . . [the] audit." (*Id.*).

The Secretary argues that Plaintiff cannot now raise this claim because Plaintiff failed to

properly raise it before the Council.  (*See* Dkt. No. 26 at 7-8).  As discussed above, in presenting

this claim to the Council, Plaintiff merely sought to "re-raise all of its arguments posed in its

position paper submitted to the ALJ for the ALJ's review." (Dkt No. 10-1 at 69).  The Council

deemed this statement to be insufficient, and accordingly did not address the claim, instead

affirming the ALJ's decision "without further discussion." (*Id.* at 5).

The Magistrate Judge agrees with the Secretary that Plaintiff failed to properly raise this claim before the Council.  As the Council noted, regulations require the identification of the parts of the ALJ's action with which the party requesting review disagrees and the reasons for the disagreement.  (*Id.* at 5 (citing 42 C.F.R. § 405.1112(b) (2017))).  Plaintiff's attempt to re-raise the arguments made before the ALJ fell short of identifying where and how the ALJ supposedly erred. *See Dominion Ambulance, L.L.C. v. Burwell*, 2017 WL 5507724, at *7 (W.D. Tex. Aug. 30, 2017); *see also New LifeCare Hospitals of N.C. LLC v. Azar*, 466 F. Supp. 3d 124, 136 (D.D.C. 2020) ("[W]hen a provider fails to raise an argument at *all* levels of administrative review, it has waived that argument for judicial review as well.").  "A federal court reviewing an agency determination will not ordinarily consider arguments that a litigant could have raised before the agency but chose not to."  *Palm Valley Health Care, Inc. v. Azar*, 947 F.3d 321, 327 (5th Cir. 2020).

Plaintiff cites to *Cypress Home Care, Inc. v. Azar*, 326 F. Supp. 3d 307 (E.D. Tex. 2018) for the proposition that the statistical sampling claim need not have been presented to the Council to preserve that claim for judicial review.  (Dkt. No. 29 at 1-2).  In *Cypress*, the district court considered whether parties in a Medicare overpayment case are required to strictly exhaust all issues before an agency prior to seeking judicial review.  326 F. Supp. 3d at 323-24.  The doctrine of issue exhaustion generally requires the party seeking judicial review, not only to have obtained a final decision from the agency, but also to have specified each issue in their request for review by the Council.  *Sims v. Apfel*, 530 U.S. 103, 107 (2000).  However, through *Sims v. Apfel*, a Social Security disability appeal, the Supreme Court held that the proceedings were not sufficiently adversarial to trigger a strict issue-exhaustion requirement.  *Id.* at 112.  Finding Medicare overpayment proceedings to be similarly non-adversarial, the *Cypress* court "decline[d] to impose a strict judicially created issue-exhaustion requirement in [the] case."  326 F. Supp. 3d at 324.

Whatever merit Plaintiff's argument may have in the abstract, it is rendered moot by § 405.1112(b)'s plain directive. As the Fifth Circuit recently held, "[b]ecause [§ 405.1112(b)] require[s] parties to identify specific ALJ errors before the [Council], . . . [a court] need not decide whether the Medicare overpayment appeals process is sufficiently adversarial to require exhaustion." *Palm Valley*, 947 F.3d at 327 n.6. Accordingly, because Plaintiff failed to properly raise the statistical sampling claim before the Council, it need not be considered. *See id.* at 328.

For these reasons, the Magistrate Judge concludes that the Council's decision regarding Plaintiff's statistical sampling claim should be affirmed.

**B. Conditions of Participation and Payment**

Plaintiff argues that the Council erred in basing its non-coverage determinations as to E.B., E.G.#1, J.L., J.M., and S.P. in part on grounds that applicable conditions of Medicare participation and payment were not met. (Dkt. No. 27 at 11-12). Relevant to these determinations was the lack of an Outcome and Assessment Information Set ("OASIS"), or a "patient-specific, standardized assessment used in Medicare home health care to plan care, determine reimbursement, and measure quality." Melissa O'Connor & Joan K. Davitt, *The Outcome and Assessment Information Set (OASIS): A Review of Validity and Reliability*, HHS PUBLIC ACCESS (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4529994/pdf/nihms-710444.pdf. As to E.G.#1, for example, the Council determined that, although the relevant skilled nursing services were reasonable and necessary, payment could not be made absent the OASIS in the record. (Dkt. No. 10-1 at 20-21). In support of the OASIS requirement, the Council cited to 42 C.F.R. § 484.55 (2008) (*id.* at 20-21), which provided at the time as follows:

> Each patient must receive, and [a home health agency ("HHA")] must provide, a patient-specific, comprehensive assessment that accurately reflects the patient's current health status and includes information that may be used to demonstrate the patient's progress toward achievement of desired outcomes. * * * The

> comprehensive assessment must . . . incorporate the use of the current version of the [OASIS] items, using the language and groupings of the OASIS items, as specified by the Secretary.

42 C.F.R. § 484.55 (2008).

According to Plaintiff, the Council erred in narrowly construing § 484.55 to require an OASIS.  (Dkt. No. 27 at 11-12).  Instead, Plaintiff argues that the regulation required a comprehensive assessment that must merely provide the OASIS informational items using specific language and groupings.  (*Id.* at 12).

The record for each of the applicable beneficiaries—excepting J.M.—does not contain any comprehensive assessment consistent with Plaintiff's desired construction of § 484.55.  As to J.M., any comprehensive assessment in the record was conducted nearly two months after the start of care (*see* Dkt. No. 12-2 at 444; *see also* Dkt. No. 12-3 at 284), which delay rendered deficient each assessment, *see* 42 C.F.R. § 584.55(b) (2008) ("The comprehensive assessment must be completed in a timely manner, consistent with the patient's immediate needs, *but no later than 5 calendar days after the start of care*." (emphasis added)).  The failure to provide an effective comprehensive assessment regarding these beneficiaries violated conditions of participation, *see* 42 C.F.R. 484.55 (2008), and, in turn, conditions of payment, *see* 42 C.F.R. § 409.41(a)(1) (2008).

For these reasons, the Magistrate Judge concludes that the Council's decision as to whether Plaintiff met applicable conditions of participation and payment for E.B., E.G.#1, J.L., J.M., and S.P. should be affirmed.

## C.  Medicare Coverage of Sample Beneficiary Claims

Plaintiff claims that the Council applied incorrect legal standards in determining that certain beneficiary claims were not covered by Medicare.  (Dkt. No. 1 at 5; Dkt. No. 27 at 7-17).

Plaintiff challenges the Council's non-coverage determinations that were based on the lack of a dated physician's signature on a "plan of care" document. (Dkt. No. 27 at 12-13). Plaintiff also argues that the Council applied guidance as to "reasonable and necessary" medical services and "homebound" status that was not in effect during the Service Period. (*Id.* at 7-17). These arguments are addressed in turn.

     1. Plan of Care Not Dated

The Council determined that two sample beneficiary claims, those concerning E.S.#2 and A.Z., were not covered, at least in part, because in each case the services were not provided under a valid document called a plan of care ("POC"). (Dkt. No. 10-1 at 34, 39). In particular, the Council found that because a physician signed but did not date the applicable POCs, as required by 42 C.F.R. § 409.43(c)(3) (2008), the claims were not covered. (*Id.*). Plaintiff does not contest that these POCs were undated. (*See* Dkt. No. 27 at 12-13).

The Magistrate Judge agrees with the Council regarding the effect of the physician's failure to date the applicable POCs. The regulation at issue provides, in pertinent part, that "[t]he [POC] must be signed and dated . . . [b]y a physician . . . and [b]efore the claim for each episode for services is submitted for the final percentage prospective payment." 42 C.F.R. § 409.43(c)(3) (2008). Plaintiff offers no reason for departing from the regulation's plain language.

For these reasons, the Magistrate Judge concludes that the Council's decision regarding the missing dates on the POCs applicable to E.S.#2 and A.Z. should be affirmed.

     2. "Reasonable and Necessary" Medical Services

Plaintiff challenges the Council's determination that the home health services provided to applicable beneficiaries, specifically, skilled nursing services, were not reasonable and necessary on different grounds, depending on the circumstances. (Dkt. No. 1 at 5; Dkt. No. 27 at 10-16).

a. *E.B., E.C., E.G.#2, E.G.#3, E.H., R.H., and E.S.#1*

Regarding E.B., E.C., E.G.#2, E.G.# 3, E.H., R.H., and E.S.#1—each of whom received skilled nursing services for insulin injections—the Council reasoned that because the record did not show that the beneficiaries were unable to self-inject insulin, the services provided were not reasonable or necessary. (Dkt. No. 10-1 at 17-26, 33-34). Plaintiff contends, however, that the Council erred in basing these denials on "paperwork requirements" that were not in effect during the Service Period. (Dkt. No. 27 at 15). As support, Plaintiff cites to *Caring Hearts*, where the Tenth Circuit noted that during the Service Period, the focus of applicable regulations was less on exacting documentation than on whether the services provided were consistent with prevailing medical practice. (*Id.* at 11 (quoting *Caring Hearts*, 824 F.3d at 976) (quotations omitted)).

Contrary to Plaintiff's contention, the Council determined that the record evidence regarding each beneficiary was either inconsistent with or did not support a finding that the services provided were reasonable or necessary. As to E.G.#2, for example, the Council determined that the record "indicates that the beneficiary has partially impaired vision which renders him unable to see medication label or newsprint, but able to see obstacles in [their] path and can count fingers at arm's length." (Dkt. No. 10-1 at 21). The Council further found that although this partially impaired vision "may prevent [E.G.#2] from prefilling syringes with insulin, the MBPM makes clear that the 'prefilling of syringes with insulin . . . does not require the skills of a licensed nurse and, therefore, is not considered to be a skilled nursing service." (*Id.* (quoting MBPM, Ch.7, § 40.1.2.4 (Effective Oct. 1, 2003))). Furthermore, the Council determined that during the Service Period, E.G.#2 "was generally stable, in no distress, and had no acute exacerbation of [their] co-morbidities." (Dkt. No. 10-1 at 22). Taking the above into account, the

Council concluded that the skilled nursing services provided to E.G.#2 during the Service Period were "not medically reasonable and necessary, and not covered by Medicare." (*Id.*).

The Council based its decision regarding other applicable beneficiaries on record evidence as well. Regarding E.G.#3 and E.H., the Council found that despite each beneficiary's partially impaired vision, they could see obstacles in their path and count their fingers at arm's length, were able to dress their upper body without assistance, and did not suffer from memory impairment or impaired decision making such that they could not self-inject insulin. (*Id.* at 23). As to R.H., the Council determined that they could dress their upper and lower body without assistance, were alert and oriented, and "generally stable, in no distress, and had no acute exacerbation of [their] co-morbidities." (*Id.* at 26). As to E.S.#1, the Council found that they had normal vision, could dress their upper body without assistance, and were negative for tremors and decision-making impairments. (*Id.* at 34).

To be clear, the Council did reference documentation deficiencies with respect to certain beneficiaries. In discussing E.B., for instance, the Council noted that the record lacked "objective records . . . that document" the severity of E.B.'s loss of vision or forgetfulness. (*Id.* at 18). Also, regarding E.C., the Council noted that "the record does not document the stage and severity of [E.C.'s Alzheimer's] disease." (*Id.* at 19). However, the Council made additional findings regarding these beneficiaries that did not depend on specific documentation requirements, but rather the evidence presented in the record, such as that (i) E.B. lacked tremors or hand weakness that would prevent the self-injection of insulin, (ii) E.C. had normal vision, was able to dress their body without assistance, and did not have tremors, and (iii) both beneficiaries were "stable, in no distress, and had no acute exacerbation of [their] co-morbidities." (*Id.* at 18-19). Indeed, these findings distinguish the instant decision from the Council's decision in *Caring Hearts*, where it

was determined that the services provided were not reasonable and necessary specifically because "the *documentation [was] insufficient* to support Medicare coverage criteria for the services at issue." *See Caring Hearts Pers. Home Servs., Inc.*, Case No. M-11-2161, 2012 WL 4503227, at *18 (HHS Aug. 29, 2012) (emphasis added). Moreover, to the extent that the Council relied on the lack of information in the record regarding the severity of a particular beneficiary's disease, it is a provider's obligation to furnish sufficient information. 42 U.S.C. § 1395(g) (Effective July 7, 2004) ("[No] . . . payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider . . . "); *Clinic Res. Mgmt. v. Burwell*, 2015 WL 3932657, at *2 (S.D. Tex. June 26, 2015) ("The provider is responsible for maintaining and submitting adequate information to substantiate medical necessity and entitlement to payment.").

For these reasons, the Magistrate Judge concludes that the Council's decision regarding whether the services provided to E.B., E.C., E.G.#2, E.G.#3, E.H., R.H., and E.S.#1 were reasonable and necessary should be affirmed.

### b. G.S.

The Council determined that the skilled nursing services Plaintiff provided to beneficiary G.S.—which took the form of injections of osteoporosis medication—were not reasonable or necessary. (Dkt. No. 10-1 at 35-36). Specifically, the Council found that applicable guidance "provided that coverage of osteoporosis drugs is limited to female beneficiaries who are eligible for [Medicare] Part B coverage of home health services, are unable to self-inject, and have sustained a bone fracture that a physician certifies was related to post-menopausal osteoporosis." (*Id.* at 35 (citing MBPM, Ch. 7, § 50.4.3 (Effective Jan. 1, 2005))). The Council noted that the record contained no evidence that G.S. met the bone fracture requirement. (*Id.* at 35-36). Plaintiff

does not contest that the record lacked any information regarding whether G.S. suffered a bone fracture related to post-menopausal osteoporosis.

Here, applicable guidance in effect during the Service Period plainly required, as a condition for coverage regarding injections of osteoporosis medication, that the "individual sustained a bone fracture that a physician certifies was related to post-menopausal osteoporosis." MBPM, Ch. 7, § 50.4.3 (Effective Jan. 1, 2005). Plaintiff does not attempt to identify any such certification in the record.

For these reasons, the Magistrate Judge concludes that the Council's decision as to whether the services Plaintiff provided to G.S. were reasonable and necessary should be affirmed.

      *c. O.L., L.L., E.V., M.V., and A.Z.*

Regarding O.L., L.L., E.V., M.V., and A.Z., the Council determined that applicable services for insulin injections were not reasonable and necessary because the record neither indicated that these beneficiaries were unable to self-inject insulin, nor explained why no family member or other caretaker was available to provide the injections. (Dkt. No. 10-1 at 27-30, 36-39). For example, regarding E.V., the Council noted that although documentation—

> indicate[d] that the beneficiary had numbness to hands and feet, and a cataract on the right eye, the beneficiary [could] independently dress [their] upper body and [could] bathe with the assistance of another person for intermittent supervision or encouragement or reminders.

(*Id.* at 36-37). The Council further noted that E.V. lived with their spouse and sons but that there was no explanation why they were unable or unwilling to administer the injections. (*Id.* at 37).

Plaintiff argues that the Council ignored applicable guidance in determining that the services provided were not reasonable and necessary. (Dkt. No. 27 at 13). During the Service Period, the MBPM provided, in pertinent part, that—

[w]here the Medicare criteria for home health services are met, patients are entitled by law to coverage of reasonable and necessary home health services. Therefore, a patient is entitled to have the costs of reasonable and necessary services reimbursed by Medicare without regard to whether there is someone available to furnish the services. However, where a family member or other person is or will be providing services that adequately meet the patient's needs, it would not be reasonable and necessary for HHA personnel to furnish such services. *Ordinarily it can be presumed that there is no able and willing person in the home to provide the services being rendered by the HHA unless the patient or family indicates otherwise and objects to the provision of the services by the HHA, or unless the HHA has first hand knowledge to the contrary.*

MBPM, Ch. 7, § 20.2 (Effective Oct. 1, 2003) (emphasis added).

Under applicable guidance in effect during the Service Period, however, insulin injections constituted reasonable and necessary skilled nursing services only where *both* (i) "a patient is either physically or mentally unable to self-inject insulin" and (ii) "there is no other person who is able and willing to inject the patient[.]" MPBM, Ch. 7, § 40.1.2.4 (Effective Oct. 1, 2003).

Here, regardless of whether findings were made as to the presence of others in the home able and willing to administer injections, the Council did make findings as to each beneficiary's ability to self-inject insulin. As to O.L., for example, the Council determined that because O.L.'s partial vision impairment did not prevent them from seeing obstacles in their path and counting their fingers at arm's length, and that O.L. could otherwise dress their upper and lower body without assistance and was negative for tremors, memory deficiencies, impaired decision-making, and sensory loss, "the record . . . [did] not support that the beneficiary had mental or physical limitations that would prevent [them] from self-injecting insulin." (Dkt. No. 10-1 at 29-30). The Council made similar findings as to the other applicable beneficiaries. (*See id.* at 27-28, 36-39).

For these reasons, the Magistrate Judge concludes that the Council's decision regarding whether the services Plaintiff provided to O.L., L.L., E.V., M.V., and A.Z. were reasonable and necessary should be affirmed.

3. "Homebound" Status

Plaintiff's argument as to the incorrect homebound standard applies to E.C., E.G.#2, E.G.#3, R.H., L.L., O.L., J.M., J.P., E.S.#1, E.S.#2, and E.V.[10] (*See* Dkt. No. 10-1 at 19-23, 25-31, 33-34, 36-37). It is worth noting upfront, however, that most of the claims relating to these beneficiaries were denied on independent grounds. Only the denial as to J.P. was based purely on grounds of the Council's homebound status determination.

During the Service Period, the MBPM read, in pertinent part, that—

[i]n order for a patient to be eligible to receive covered home health services . . . , the law requires that a physician certify in all cases that the patient is confined to [their] home. An individual does not have to be bedridden to be considered confined to the home. However, *the condition of these patients should be such that there exists a normal inability to leave home and, consequently, leaving home would require a considerable and taxing effort.*

\* \* \*

Generally speaking, *a patient will be considered to be homebound if they have a condition due to an illness or injury that restricts their ability to leave their place of residence except with the aid of: supportive devices* such as crutches, canes, wheelchairs, and walkers; *the use of special transportation; or the assistance of another person; or if leaving home is medically contraindicated.*

MBPM Ch. 7, § 30.1.1 (Effective Oct. 1, 2003) (emphasis added). In 2013, however, CMS amended the MBPM's homebound criteria to require as follows:

1. Criteria-One:

The patient must either:

- Because of illness or injury, need the aid of supportive devices such as crutches, canes, wheelchairs, and walkers; the use of specifical transportation; or the assistance of another person in order to leave their place of residence

---

[10] In the Complaint, Plaintiff states that, regarding E.H., "the [Council] sustained the ALJ's negative findings regarding homebound eligibility." (Dkt. No. 1 at 5). This is belied by the record, as the Council expressly found that E.H. was homebound. (*See* Dkt. No. 10-1 at 24). Accordingly, the undersigned concludes that this reference to E.H. in the Complaint was made in error.

OR

- Have a condition such that leaving his or her home is medically contraindicated.

If the patient meets one of the Criteria-One conditions, then the patient must ALSO meet two additional requirements defined in criterion two below.

2.   Criteria-Two:

- There must exist a normal inability to leave home;

AND

- Leaving home must require a considerable and taxing effort.

*Cypress*, 326 F. Supp. 3d at 314 (emphasis omitted).

Plaintiff contends that the Council effectively applied the more onerous 2013 standard rather than the one in effect during the Service Period. (Dkt. No. 27 at 7-8). In support, Plaintiff points to various parts of the Council's decision where the agency bases its non-coverage determinations on findings that the particular beneficiaries do not have a normal ability to leave home or that leaving home does not require a considerable and taxing effort. (*Id.*). Plaintiff relies on the Tenth Circuit's *Caring Hearts* decision, which involved a textual analysis of both § 30.1.1 of the MBPM and the statute this guidance interprets, specifically, 42 U.S.C. § 1395f. (*See id.*).

The Secretary counters that the Council did, in fact, apply the correct standard, noting that the Council cited to the guidance in effect during the Service Period. (Dkt. No. 28 at 2). Moreover, according to the Secretary, the 2008 guidance expressly provided that to be considered homebound, a beneficiary's "condition . . . should be such that there exists a normal inability to leave the home and, consequently, leaving home would require a considerable and taxing effort."[11]

---

[11] The Secretary repeatedly asserts that Plaintiff is not entitled to judgment as a matter of law because whether the Council applied the correct standard "is a disputed issue of material fact." (*See* Dkt. No. 28 at 3-4, 6-8, 11, 16). This is plainly incorrect, as "[w]hether an agency applies the correct legal standard is a question of law." *Reyes v. Att'y Gen. of U.S.*, 390 F. App'x 163, 165 (3d Cir. 2010) (per curiam).

(*Id.* at 6 (quoting MBPM, Ch. 7, § 30.1.1 (Effective Oct. 1, 2003)).  The Secretary also notes that

*Caring Hearts* does not constitute binding authority in the Fifth Circuit.  (Dkt. No. 26 at 13-14).

Because of Plaintiff's reliance on *Caring Hearts*, the pertinent parts of that decision must

be discussed.  As the Eastern District of Texas in its *Cypress* decision summarized:

> In *Caring Hearts*, the [Tenth Circuit] explained the key difference between the
> 2008 regulation and the 2013 version.  In short, the 2008 version encompasses a
> wider universe of people who might qualify as "homebound."  Under the 2008
> version, a patient would be considered homebound if she could not leave home
> "except with the aid of" a supporting device.  Yet under the 2013 version, simply
> requiring the use of a supportive device is not enough, as the patient must also
> satisfy the two additional requirements under criteria two: "[t]here must exist a
> normal inability to leave home" and "[l]eaving home must require a considerable
> and taxing effort."  Thus, the key difference is "rather than asking whether a patient
> could leave home *with* a supportive device, the regulations back then [in 2008]
> seemed to ask whether a patient could leave home *without* one."

*Cypress*, 326 F. Supp. 3d at 315 (citing *Caring Hearts*, 824 F.3d at 971-72) (citations omitted).

Analyzing the statutory language, the *Caring Hearts* court noted that § 1395f uses different

verbs in two pertinent sentences.  824 F.3d at 972-73.  The first sentence provides:

> [A]n individual *shall* be considered to be "confined to [their] home" if [they have]
> a condition, due to illness or injury, that restricts [their] ability . . . to leave [their]
> home except with the assistance of another individual or the aid of a supportive
> device (such as crutches, a cane, a wheelchair, or a walker), or if the individual has
> a condition such that leaving [their] home is medically contraindicated.

42 U.S.C. § 1395f(a) (emphasis added).  The second sentence provides:

> While an individual does not have to be bedridden to be considered "confined to
> [their] home," the condition of the individual *should* be such that there exists a
> normal inability to leave home and that leaving home requires a considerable and
> taxing effort by the individual.[12]

*Id.* (emphasis added).  This verb difference, according to the Tenth Circuit, "suggest[s] that the

second sentence provides useful but not necessarily dispositive tests for homebound status."

_____

[12] The guidance in effect during the Service Period provided, inter alia, that a beneficiary's condition
"should" be such that there exists a normal inability to leave home and that leaving home requires a
considerable and taxing effort.  *See* MBPM, Ch. 7, § 30.1.1 (Effective Oct. 1, 2003).

*Caring Hearts*, 824 F.3d at 973. The Tenth Circuit also noted that the first sentence provides that a person shall be homebound *either* because they require the assistance of an individual or a supportive device to leave the home *or* because leaving the home is medically contraindicated, the latter provision implying that a person can be considered homebound even if leaving the home does not require a considerable and taxing effort. *Id.*

Here, the Magistrate Judge, like the Eastern District of Texas in *Cypress*, "finds *Caring Hearts* [homebound analysis] to be persuasive, as *Caring Hearts* dealt with the same statute and regulations at issue in this case." *See Cypress*, 326 F. Supp. 3d at 314. The Magistrate Judge acknowledges the intellectual rigor of the *Caring Hearts* decision, the fact that two other federal district courts in the Fifth Circuit have adopted the decision's reasoning,[13] and the fact that the Fifth Circuit has positively cited *Caring Hearts*, albeit for the general principle that "[a]gency actions must be assessed according to the statutes and regulations in effect at the time of the relevant activity[,]" *Texas*, 829 F.3d at 430 (citing *Caring Hearts*, 824 F.3d at 971). Accordingly, the Tenth Circuit's reasoning in *Caring Hearts* regarding homebound status should be adopted.

Applying *Caring Hearts* to this case leads to the conclusion that the Council applied the wrong standard as to homebound status. For example, the Council determined that beneficiary J.P. was not homebound because "the record [did] not support that *leaving home would require a considerable and taxing effort.*" (Dkt. No. 10-1 at 31 (emphasis added)). In fact, the applicable homebound denials were premised on whether the respective beneficiaries had a normal inability to leave the home or required a considerable and taxing effort to do so. In sum, the Council based these decisions on criteria that were either not in effect or dispositive during the Service Period.

---

[13] Apart from the Eastern District of Texas in *Cypress* is the Western District of Louisiana in *Central Louisiana Home Health Care, L.L.C. v. Price*, 2018 WL 7888523 (W.D. La. Dec. 28, 2018), *report and recommendation adopted*, 2019 WL 1388773 (W.D. La. Mar. 27, 2019).

That said, on remand, the practical effect of this error is limited only to J.P. because, as discussed above, the Council had separate grounds supporting its denials regarding E.C., E.G.#2, E.G #3, R.H., L.L., O.L., J.M., E.S.#1, and E.V.

For these reasons, the Magistrate Judge concludes that the Council's homebound denial as to J.P. should be vacated and remanded to the Council for further proceedings consistent herewith.

## D.  Provider Without Fault

According to Plaintiff, the Council erred when it determined that Plaintiff was not a provider "without fault" pursuant to 42 U.S.C. § 1395pp.[14]  (Dkt. No. 27 at 16-17).  The Council found, in part, that Plaintiff had constructive notice of coverage criteria and thus knew or should have known that the applicable services were not covered by Medicare.  (Dkt. No. 10-1 at 40).  Plaintiff argues that, because the Council itself applied incorrect standards, Plaintiff is now entitled to § 1395pp's waiver of liability.  (Dkt. No. 27 at 17).

In support, Plaintiff cites to the *Caring Hearts* and *Cypress* decisions.  (*Id.* at 16-17).  In *Caring Hearts*, the Tenth Circuit, after determining that the agency applied incorrect standards, vacated the district court's order affirming the Council's denial of relief under § 1395pp and remanded the case to the district court with instructions to return it to the agency for further proceedings.  824 F.3d at 977.  In so doing, the Tenth Circuit offered dicta that "it seems pretty

---

[14] For reference, § 1395pp provides, in pertinent part, that where—

   (1)  a determination is made that, by reason of [applicable Medicare law], payment may not be made under part A or part B [of Medicare] . . . , and

   (2)  both such individual and such provider of services or such other person, as the case may be, did not know, and could not reasonably have been expected to know, that payment would not be made for such items or services under [Medicare],

   then to the extent permitted by this subchapter, payment shall, notwithstanding such determination, be made for such items or services . . . .

42 U.S.C. § 1395pp(a).

clear from the record" that a beneficiary would qualify as homebound under the correct standard. *Id.* at 972. The *Cypress* court, relying on *Caring Hearts*, determined that the Council's application of incorrect law entitled the plaintiff to waiver of overpayment without further agency proceedings. *Cypress*, 326 F. Supp. 3d at 317-18, 330.

Although Plaintiff is correct that the Council applied incorrect standards regarding homebound status (which only have a practical effect in J.P.'s case), Plaintiff does not establish that it is *now* entitled to relief under § 1395pp. Other than *Cypress*, Plaintiff does not cite any authority establishing a district court's authority to determine a plaintiff's entitlement to an overpayment waiver prior to a remand to an agency where, as here and unlike in *Caring Hearts*, a provider's good faith is not apparent from the record. *See PAM Squared at Texarkana, LLC v. Azar*, 436 F. Supp. 3d 52, 61 (D.D.C. 2020) (observing that remand to an agency is appropriate where a court has "more than 'the slightest uncertainty' about the agency's decision on remand" (quoting *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1489 (D.C. Cir. 1995)). Accordingly, the appropriate course of action is for the Council's § 1395pp determination to be vacated and remanded for further proceedings. *See N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) ("When a district court . . . determines that [an] agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency . . . .").

For these reasons, the Magistrate Judge concludes that the § 1395pp determination should be vacated and remanded to the Council for further proceedings consistent herewith.

## V. ATTORNEY'S FEES

Plaintiff's counsel seeks $91,500.00 in attorney's fees. (Dkt. No. 30; Dkt No. 30-1). Plaintiff's counsel claims to have worked 305 hours litigating this case, which amount includes work relating to administrative proceedings, at a rate of $300 per hour. (Dkt. No. 30-1 at 2). In

support, counsel has filed an exhibit listing the dates he worked on the case and detailing the work conducted on each date. (Dkt. No. 31).

This request for attorney's fees is premature. Applicable law provides that "[a] party seeking an award of fees and other expenses shall, within thirty days of *final judgment* in the action, submit to the court an application for fees and other expenses . . . ." 28 U.S.C. § 2412(d)(1)(B) (emphasis added); *see also Sowe v. Mukasey*, 538 F.3d 1281, 1289 (9th Cir. 2008) (denying request by plaintiff for attorney's fees as premature where final judgment had not issued). A "final judgment" for § 2412 purposes is "a judgment that is final and not appealable," 28 U.S.C. § 2412(d)(2)(G), and which only becomes final "when the time for seeking appellate review has run," *Shalala v. Schaefer*, 509 U.S. 292, 298 (1993). Given that the District Court has yet to enter an order resolving this case, the deadline for seeking appellate review has not expired.[15]

---

[15] Plaintiff's request for attorney's fees potentially suffers from additional defects. The relevant attorney's fees statute provides that "attorney['s] fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A). The requested billing rate here is $300 per hour. However, Plaintiff's counsel offers nothing beyond conclusory statements to support his claim of entitlement to his requested fee payment, such as that his fee is "based on the skills requisite to perform the legal services necessary on this case, as well as the customary fee in the area of this type of practice." (Dkt. No. 30-1 at 2). Indeed, Plaintiff does not establish the kind of "distinctive knowledge or specialized skill needful for the litigation in question" the Supreme Court has held necessary to depart from the statutory cap. *See Pierce v. Underwood*, 487 U.S. 552, 572 (1988). Although the Medicare system is no doubt complex, it is "no more complex than countless other federal regulatory schemes, and attaining proficiency in these areas is not beyond the grasp of a competent practicing attorney with access to . . . the . . . accoutrements of modern legal practice." *Healey v. Leavitt*, 485 F.3d 63, 70 (2d Cir. 2007) (quoting *Chynoweth v. Sullivan*, 920 F.2d 648, 650 (10th Cir. 1990) (internal quotations omitted)). Moreover, Plaintiff seeks the payment of fees for work completed during the administrative proceedings which are not awardable pursuant to § 2412(d), *see Habitat Educ. Ctr., Inc. v. Bosworth*, 2006 WL 839166, at *3-4 (E.D. Wis. Mar. 29, 2006), and must instead be requested before the administrative agency pursuant to 5 U.S.C. § 504. The Magistrate Judge also notes that Plaintiff's counsel, in Plaintiff's position paper before the ALJ, stated that he was "[Plaintiff's] sole shareholder and President" (Dkt. No. 10-1 at 201), and in Plaintiff's post-hearing brief before the ALJ, referred to himself as "[Plaintiff's] sole proprietor," (*id.* at 238). Although the precise effect of this fact does not appear to have been addressed by the courts, it is arguably analogous to a request for payment of fees by an attorney appearing pro se, which requests are typically rejected. *See Gahagan v. U.S. Citizenship & Immigr. Servs.*, 911 F.3d 298, 305 (5th Cir. 2018); *see also In re Texaco Inc. S'holder Derivative Litig.*, 123 F. Supp. 2d 169, 172-73 (S.D.N.Y. 2000) (collecting cases).

For these reasons, the Magistrate Judge concludes that Plaintiff's request for attorney's fees should be denied as premature.

## VI. CONCLUSION

The Magistrate Judge RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. No. 27) be GRANTED in part and DENIED in part, that the Secretary's Motion for Summary Judgment (Dkt. No. 26) be GRANTED in part and DENIED in part, that the Motion for Attorney's Fees (Dkt. No. 30) be DENIED as premature, and that the final decision of the Secretary be VACATED and REMANDED to the agency for further proceedings consistent herewith.

In summary, the Magistrate Judge recommends as follows:

- that the Council's denial regarding Plaintiff's statistical sampling and extrapolation procedures claim be affirmed;

- that the Council's denials regarding E.B., E.C., E.G.#1, E.G.#2, E.G.#3, E.H., R.H., J.L., L.L., O.L., J.M., S.P., E.S.#1, E.S.#2, G.S., E.V., M.V., and A.Z. be affirmed;

- that the Council's denial regarding J.P. be reversed and remanded to the agency for further proceedings consistent herewith;

- that the Council's § 1395pp denial be reversed and remanded to the agency for further proceedings consistent herewith; and

- that Plaintiff's request for attorney's fees be denied as premature.

### *Notice to the Parties*

Within fourteen (14) days after being served a copy of this report, a party may serve and file specific, written objections to the proposed recommendations. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). Failure to file written objections within fourteen (14) days after service shall bar an aggrieved party from de novo review by the District Court on an issue covered in this report and from appellate review of factual findings accepted or adopted by the District Court, except on grounds of clear error or manifest injustice.

DONE at McAllen, Texas this 1st day of February 2022.

J. SCOTT HACKER
United States Magistrate Judge